Constance S. GERBUSH, Plaintiff,

v.

**HUNT REAL ESTATE CORPORATION, Defendant.**

No. 97–CV–0835C (H).

United States District Court, W.D. New York.

Dec. 30, 1999.

Willard M. Pottle, Jr., Buffalo, NY, for Plaintiff.

Buchanan Ingersoll, P.C., Ginger D. Schroder, of counsel, Buffalo, NY, for Defendant.

## DECISION and ORDER

CURTIN, District Judge.

Plaintiff Constance Gerbush ("plaintiff") commenced this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Equal Pay Act ("EPA"), 29 U.S.C. § 206, *et seq.* Plaintiff also asserts a claim under the New York Human Rights Law ("NYHRL"), New York Executive Law § 296, *et seq.* Plaintiff alleges that defendant Hunt Real Estate Corporation ("Hunt") discriminated against her on account of her sex. Presently before this court is defendant's motion for summary judgment. Items 12–17. Plaintiff opposes. *See* Items 20–22. Oral argument was held on September 23, 1999.

## BACKGROUND

### Facts

The facts are as follows. Hunt is a real estate agency focused on listing and selling property in the Western New York Region. Item 1; Complaint ¶ 4. As an agency, Hunt relies on sales agents to list and sell residential or commercial properties. Sales agents, however, are not employees of Hunt, but rather independent contractors who generally work out of one of Hunt's various branch offices. Item 13; Izzo Aff. ¶¶ 4, 8. Each branch office is managed by a branch manager. In some instances, a branch manager may be assigned to manage two branches, depending

on the size and volume of business operating out of those branches. *Id.*

During the time frame of this law suit, Hunt maintained its corporate headquarters in Williamsville, New York, and branch offices in Buffalo, Kenmore, Wheatfield, Williamsville South, Williamsville North, Orchard Park, East Aurora, Hamburg, West Seneca, Lockport, Newfane, Cheektowaga, Lewiston, and Amherst. Item 17; Exh. Q.

In contrast to sales agents, branch managers are considered employees of Hunt. Upon acceptance of the position, each branch manager signs a contract, which is somewhat uniform but customized as to base salary. Each contract (including the annual contract signed by plaintiff) sets forth a formula for the calculation of bonuses paid out on a quarterly or annual basis. The contract given to branch managers during the time frame of this case includes the following formula:

b. A quarterly bonus based on the following formula: 10% of settled Company Dollar for the previous fiscal quarter, *LESS total weekly salary for the previous fiscal quarter* = *New Quarterly Bonus*

c. A fiscal year (annual) bonus based on the following formula: 10% of the "excess return" generated by the branch in current fiscal year. "Excess return" is defined as pre-tax profit *exceeding* 3% of gross commission revenue, or equivalently, income before overhead exceeding *13.8%* of branch gross commission revenue. An additional component of this fiscal year bonus will be a $1,500.00 travel voucher which will be earned by the manager upon *achieving* the threshold level, i.e., 3% pre-tax return on gross commission revenue or equivalently, *13.8%* return at income, before overhead.

Item 17; Exh. F. Essentially, salaries for branch managers are set at 10 percent of

the expected Settled Company Dollar ("SCD")[1] for the manager's branch. The bonus is 10 percent of the actual SCD, minus the base salary already paid out. *See* Item 22; Exh. E; Grieser Dep. at p. 52; *see also* Item 17; Exh. F.

In 1989, plaintiff was hired as a sales agent at Hunt's Kenmore branch. She also worked out of the Buffalo office, which was at that time considered a "satellite" office of the Kenmore and Amherst branches. *See* Item 16; Exh. C, Gerbush Deposition at ¶¶ 14–17; *see also* Item 13; Izzo Aff. ¶ 13. In December of 1989, Hunt decided to make the Buffalo satellite office an independent branch, and selected plaintiff as the manager. *See* Gerbush Dep. at ¶¶ 14–17.

Officially, plaintiff started at the Buffalo branch as a "manager-in-training" on January 1, 1990. Item 16, Exh. C, Gerbush Dep. at p. 17. Her compensation under that title was approximately $18,000. *Id.* This amount was significantly less than what she would earn as a branch manger because it accounted for commissions Gerbush had earned as a sales agent from completed, but not closed, sales. *Id.*

After all of her completed sales had closed, Gerbush's base salary was increased to $25,000, which could and was supplemented by quarterly and annual bonuses. Item 1; Compl. ¶ 6. In 1991, Gerbush's base salary was further increased to $40,000. *Id.* From 1993 up until her termination in 1996, plaintiff earned a base salary of $42,500. *Id.* Plaintiff received a $4,068 bonus in 1993. Item 17; Exh. P.

In May of 1996, Hunt fired Gerbush due to her allegedly poor performance as manager of the Buffalo branch. Item 13; Izzo Aff. ¶ 21. Although plaintiff never received notice of poor job performance, she admits that the Buffalo branch was not a profitable operation in the six years that she worked there. Item 16; Exh. C; Gerbush Dep. at ¶¶ 55–60. Hunt did not re-

---

1. The SCD is money that the branch office retains after Hunt (as broker) and the sales agent's commissions are paid out. Item 13; Izzo Aff. ¶ 10.

place Gerbush, but rather consolidated the Buffalo branch with the Cheektowaga branch, which was managed by John Rummel. Item 13; Izzo Aff. ¶¶ 22–24.

### Procedural History

Shortly after her termination, Gerbush filed a discrimination complaint with Equal Opportunity Commission ("EEOC"). She received a Right to Sue letter and filed this suit on October 21, 1997. Gerbush alleges that from 1990 until her termination in April of 1996, she and other female branch managers were paid $10,000 to $30,000 less than male managers, in violation of the EPA, Title VII and the NYHRL. Item 1; Compl. ¶ 8. Plaintiff further claims that she was denied bonuses because she was a female, and male managers were awarded bonuses because they were male, again in violation of the EPA, Title VII, and the NYHRL.

Gerbush seeks back pay equivalent to the salaries paid to similarly situated male employees, including bonuses. She also seeks compensatory damages for the loss of her job, attorney's fees, and injunctive relief.

### DISCUSSION

### I.  Summary Judgment Standard

Summary judgment is appropriate only where the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). It is the burden of the moving party to demonstrate initially the absence of material fact. Celotex, 477 U.S. at 323–25, 106 S.Ct. 2548. Once the moving party has satisfied its burden, the burden then shifts to the non-moving party to produce "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A showing that there is a genuine issue of fact for trial requires a showing sufficient to establish the existence of every element essential to the party's case, and on every element for which the party will bear the burden of proof at trial.

Of course, in ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1985). The Second Circuit has emphasized that the trial court must be especially cautious in deciding whether to grant this drastic provisional remedy in a discrimination case, because the employer's intent is often at issue, and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination. See Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir.1996); Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir.1994). Nonetheless, where the non-movant's evidence is merely conclusory or speculative, or not significantly probative, summary judgment should be granted. Knight v. U.S. Fire Ins. Co., 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

### II.  Equal Pay Claim

To establish an equal pay claim under the EPA or Title VII, plaintiff must demonstrate that: "(i) the employer pays different wages to employees of the opposite sex; (ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (iii) the jobs are performed under similar working conditions." Tomka v. Seiler Corp., 66 F.3d 1295, 1310 (2d Cir.1995); see also Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999). Equal pay claims are generally analyzed according to the same standards under the EPA, Title VII, and the NYHRL, although on a Title VII and NYHRL claim, the plaintiff must also produce evidence of a discriminatory animus. See Dinolfo v. Rochester Telephone Corp., 972 F.Supp. 718, 721 (W.D.N.Y.1997) (cit-

ing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1310 (2d Cir.1995)).[2] Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to prove that the disparity is justified by one of the four affirmative defenses: a merit system, a seniority system, a system which measures quality or quantity of production, or a differential based on any factor other than sex. 29 U.S.C. § 206(d)(1); *see Dinolfo v. Rochester Telephone Corp.,* 972 F.Supp. at 721; *see also Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 132 (2d Cir.1996).

In the present case, plaintiff fails to satisfy the second and third elements of a prima facie case. To satisfy the second element of the analysis, "[a] plaintiff need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are 'substantially equal.'" *Tomka,* 66 F.3d at 1309 (citing *Lambert v. Genesee Hospital,* 10 F.3d 46, 56 (2d Cir.1993)). The test is whether additional labor or tasks of one job in comparison to another job are substantial. *Lambert,* 10 F.3d at 56. If so, the jobs cannot be considered congruent, and the work performed is not equal as required by the EPA. *Id.* Moreover, the standard under the EPA is job content, and not job description or job title. *Tomka,* 66 F.3d at 1310.

■ Here, plaintiff fails to establish that her responsibilities as manager of Hunt's Buffalo branch were substantially equal to the responsibilities of the higher-paid male managers. Plaintiff attempts to rely on the uniform job description that was distributed to all managers to establish that the jobs were substantially similar. However, plaintiff's deposition testimony reveals that the uniform job description is largely irrelevant, because the job respon-

sibilities of branch managers were substantially different. At her deposition, plaintiff conceded that the amount of time required by branch managers differed from office to office and was largely dependent on the specific branch's composition levels and their agent population. Item 17; Exh. C; p. 122. Moreover, plaintiff admitted that the number of agents varied from office to office, and each branch differed in size, sales, volume, inventory of units, gross commission percentages, and level of recruiting. *Id.* at 208–10. Plaintiff also admitted during her deposition that the financial performance of the Buffalo branch was not "comparable" to other offices; and that if the branches were ranked by performance, the Buffalo branch would be near the bottom. *Id.* at 135–36.

In sum, plaintiff concedes that certain managers invested additional labor depending on the level of business being conducted at their branch. As such, plaintiff has failed to show that she, as manager of the financially declining Buffalo branch, shared substantially similar responsibilities with branch managers of Hunt's more profitable branches.

Plaintiff also fails to establish that she worked under similar working conditions as the male managers. Again, the court refers to plaintiff's deposition testimony, wherein she concedes that the Buffalo branch was not as viable as Hunt's other branches, and that the more viable branches required a greater investment of a manager's time.[3] *See* Item 16; Exh. C; Gerbush Dep. at ¶¶ 122, 135–36, 194, 208–210. Based on these statements, plaintiff did not perform her job responsibilities under the same conditions as managers employed at the more profitable branches. As such,

**2.** "[T]he standards under the New York Human Rights Law are the same as those under Title VII ...." *Pollis v. New School of Social Research,* 132 F.3d 115, 124 (citing *Tomka,* 66 F.3d at 1304 n. 4).

**3.** Although they do not flatly agree that the labor required by branch managers differed

depending on the branch location, both Wallace Grieser and Patricia Bimber concede that working at a larger branch with a large number of agents is more time-consuming than working at branch with fewer agents. *See* Item 22; Exhs. D and E.

plaintiff fails to make a prima facie showing under the EPA and Title VII; and therefore, her equal pay claim is dismissed.

▆ Even if plaintiff was capable of establishing a prima facie case of salary discrimination, defendant is nonetheless entitled to summary judgment because the record establishes that the pay disparity between male and female branch managers resulted from a merit system.

"Unequal pay for equal work is justified when the payment is made pursuant to a merit system." *Ottaviani v. State University of New York at New Paltz*, 679 F.Supp. 288, 337 (S.D.N.Y.1988), *aff'd*, 875 F.2d 365 (2d Cir.1989) (citing 29 U.S.C. § 206(d)(1)(ii)). "The merit system must be an organized and structured procedure whereby employees are evaluated systematically according to predetermined criteria." *Id.*

In the present case, Hunt's compensation structure for branch managers qualifies as a merit or reward system. Absent other factors such as experience and salary retention, Hunt sets its base salaries for branch managers at or near 10 percent of the projected SCD that the manager's branch is likely to earn for the upcoming year. Item 13, Izzo Aff. ¶ 18; Item 16, Exh. D; Hunt Deposition at ¶¶ 40–50. In an effort to encourage managers to increase their branch's SCD, Hunt awards bonuses on a quarterly and annual basis. The formula for calculating the bonuses is identical for each branch. Essentially, bonuses are equal to 10 percent of the difference between the actual SCD and the projected SCD. *See* Item 17; Exhs. F–O; *see also* Item 22; Exh. E; Grieser Dep. at p. 52.

For example, if Hunt expected a particular branch to have a SCD of $400,000, the base salary of the manager of that branch would likely be $40,000. If at the end of

the fiscal year, the branch had a SCD amount of $600,000, the branch manager would receive a $20,000 dollar bonus (*i.e.*, 10 percent of $200,000).[4]

The financial documents on record indicate that only those branch managers whose branch earned more the projected SCD received a bonus. For example, in 1995 Paul Kessler received a base salary of $73,557.81. Thus, it appears under the formula that Hunt projected the Orchard Park branch to earn approximately $700,-000. However, the branch only earned a SCD of approximately $400,000. As a result, Kessler did not receive a bonus for the year 1995.

In comparison, Carol Grieco had a base salary $65,000 in 1995. Again, it appears that Hunt projected Grieco's branch, the Williamsville North Branch, to earn a SCD of $650,000. In 1995, the Williamsville North Branch actually earned a SCD of close to $900,000, which resulted in Carol Grieco's receiving a bonus of $30,741 (*i.e.*, 10 percent of $300,000).

Based on the above, Hunt's overall wage structure for its branch managers constitutes a merit system under 29 U.S.C. § 206(d)(1)(i). As such, defendant has shown that the pay disparity results from one of the four affirmative defenses, and plaintiff's equal pay claims are dismissed.

### *CONCLUSION*

Defendant's motion for summary judgment is granted, and the complaint is dismissed.

So ordered.

---

4. Notably, the base compensation for branch managers is unaffected should the branch

fails to reach its projected SCD.