JOSEPH FRADIANNI *v.* PROTECTIVE LIFE
INSURANCE COMPANY ET AL.
(AC 34550)

Gruendel, Lavine and Beach, Js.

Argued April 11—officially released August 20, 2013

*Keith Yagaloff,* for the appellant (plaintiff).

*Katherine A. Scanlon,* with whom was *Peter J. Vodola,* for the appellee (named defendant).

*Opinion*

GRUENDEL, J. The plaintiff, Joseph Fradianni, appeals from summary judgment rendered by the trial court in favor of the defendant, Protective Life Insurance Company.[1] He claims that the court improperly found that the defendant was entitled to judgment as a matter of law because no genuine issue of material fact exists as to whether the plaintiff's claims were time barred.[2] We agree, and accordingly, reverse the judgment of the court.

The following facts and procedural history are pertinent to this appeal. In 1992, the plaintiff entered into a contract for universal life insurance[3] with the defendant's predecessor in interest, Interstate Assurance

[1] Louis Gulino was also a defendant originally named in the plaintiff's action, but is not a party to this appeal. We, therefore, refer to Protective Life Insurance Company as the defendant throughout this opinion.

[2] The plaintiff baldly asserts that the court erred in denying his own motion for summary judgment, but does not brief the issue in any manner. We, therefore, deem this claim abandoned. See *Roby* v. *Connecticut General Life Ins. Co.,* 166 Conn. 395, 398 n.1, 349 A.2d 838 (1974) (claims not briefed deemed abandoned). During oral argument before this court, the plaintiff also abandoned all but his breach of contract claim. Accordingly, we review only this claim.

[3] The glossary published by the Connecticut Insurance Department defines "universal life insurance" as: "A flexible premium [l]ife [i]nsurance [p]olicy under which the policyholder may change the death benefit from time to time (with satisfactory evidence of insurability for increases) and vary the amount or timing of premium payments. Premiums (less expense charges)

Company (Interstate), which provided for a $130,000 death benefit. According to the policy schedule, the policy had a seventeen year guaranteed death benefit with a monthly minimum premium of $267.80, or $3213.60 annually. Incorporated into the written policy provided to the plaintiff was a "table of monthly guaranteed cost of insurance rates," which indicated, based on the age of the insured, the maximum rate the plaintiff could be charged for the insurance component of the policy. The table illustrates that the rate of the cost of insurance increases with the age of the insured. The table also contained the statement that "[f]or cost of insurance rates which are not standard class,[4] the schedule may show . . . rating factors[5] to be applied to [the] table . . . and/or . . . additional monthly charges." According to the document listing the policy's benefit information, the policy was issued to the plaintiff with a "rating factor [of] 100%." The policy itself states that the "Cost of Insurance rates will not exceed those shown in the Table . . . ."

When purchasing the policy, the plaintiff also received an "exchange program illustration," which

---

are credited to a policy account from which mortality charges are deducted and to which interest is credited at a rate, which may change from time to time." Connecticut Insurance Department, "Glossary," (last modified August 30, 2011), available at http://www.ct.gov/cid/cwp/view.asp?Q=390158 (last visited August 8, 2013).

[4] As defined by the Connecticut Insurance Department, a "standard risk" is "[a] person, who, according to a company's underwriting standards, is entitled to purchase insurance protection without extra rating or special restrictions." Connecticut Insurance Department, "Glossary," (last modified August 30, 2011), available at http://www.ct.gov/cid/cwp/view.asp?Q=390158 (last visited August 8, 2013).

[5] A "rated policy," as defined by the Connecticut Insurance Department, is "[a]n insurance policy issued at a higher-than-standard premium rate to cover a higher-than-standard risk; for example, for an [i]nsured who has impaired health or a hazardous occupation." Connecticut Insurance Department, "Glossary," (last modified August 30, 2011), available at http://www.ct.gov/cid/cwp/view.asp?Q=390158 (last visited August 8, 2013).

detailed the value of the policy over its life, if the plaintiff were to pay $4700 in the first year and $2600 annually for the following eleven years. Thereafter, the illustration assumes no payment by the plaintiff. After year twelve, the illustration indicates that the net accumulated value decreases substantially each year until year nineteen when, as the illustration states, "more premium [is] needed to maintain policy values."

The plaintiff made a $4700 payment at the inception of the policy and, thereafter, paid toward the policy $2600 per year. A portion of these payments was dedicated to funding the cost of insurance and the balance was placed in an interest-bearing investment account[6] from which future cost of insurance charges would be deducted, or would otherwise accumulate for his benefit. The policy set forth the formula by which the "cost of insurance" would be calculated: "The Cost of Insurance for the Insured is (a) times the result of (b) less (c) divided by 1000 where . . . (a) is the Cost of Insurance Rate; (b) is the Insured's Death benefit on the Monthly Anniversary Date divided by 1.0036748; and (c) is the Accumulated Value on the Monthly Anniversary Date." The policy also provided for a sixty-one day grace period in the event that "the Cash Value on any Monthly Anniversary Date . . . is not sufficient to pay the next Monthly Deduction [comprised of the Cost of Insurance plus any monthly policy charges]."

The defendant sent the plaintiff annual reports detailing the value of the policy, the interest rate applied to the funds in the investment account, and the projected date on which the policy would terminate based on the applicable interest and mortality assumptions.[7] In

---

[6] The contract guaranteed an interest rate of 4.5 percent for funds placed in this account.

[7] At least one of these reports, the report for the period from 2005 to 2006, contains the following alert: "Important: Based on current interest and mortality assumptions, [the] policy will terminate" on May 16, 2008.

February 2003, the plaintiff or his wife inquired with the defendant about the status of his policy. The defendant, in response, provided an illustration explaining that "[b]ased on guaranteed assumptions, [the] policy would terminate in 2006 unless higher premiums were paid." In September, 2008, the plaintiff's policy lapsed because the funds available in the investment account combined with the plaintiff's payment were insufficient to cover the cost of insurance. The defendant offered to reinstate the policy after its lapse if the plaintiff made a one time payment of $5257 and agreed to pay $620 monthly thereafter. The plaintiff rejected the offer.

On August 16, 2010, the plaintiff filed an amended complaint alleging, inter alia, that the defendant engaged in a course of conduct whereby it breached its contract with him by: (1) charging rates in excess of those outlined in the policy; (2) failing to place the appropriate amount of his annual payments into the investment account; (3) allowing his policy to lapse; and (4) requiring him to make a one time payment of $5257 and monthly payments in excess of the guaranteed maximum under the policy in order to reinstate the policy. Thereafter, the defendant moved for summary judgment on the ground that the plaintiff's claims were barred by the six year statute of limitations set forth in General Statutes § 52-576 (a). The plaintiff objected to the motion, arguing that the continuing course of conduct doctrine tolled the statute of limitations.

The court granted the defendant's motion, concluding that the continuing course of conduct doctrine did not toll the statute of limitations because the defendant did not owe a fiduciary duty to the plaintiff, nor was the defendant's periodic charging of the plaintiff and the ultimate lapse of the policy properly characterized as later wrongful conduct related to its alleged initial wrongful act that would give rise to a continuing duty

owed to the plaintiff. The court also rejected the plaintiff's alternative argument that each annual charge by the defendant constituted a breach of the contract, placing within the statute of limitations his claims arising from the policy lapse and the charges occurring within the six years prior to the filing of his complaint. From this judgment, the plaintiff now appeals.

"As a preliminary matter, we set forth the applicable standard of review for appeals from the entry of summary judgment. Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . On appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Internal quotation marks omitted.) *Rainforest Cafe, Inc.* v. *Dept. of Revenue Services*, 293 Conn. 363, 371, 977 A.2d 650 (2009).

I

The plaintiff first claims that the trial court erred in finding that the continuing course of conduct doctrine did not toll the six year statute of limitations prescribed by § 52-576 (a). Specifically, he claims that the defendant engaged in a breaching course of conduct, beginning in 1992, when the defendant annually charged the

plaintiff the cost of insurance applicable to insureds classified as double the standard risk, in excess of the maximum cost of insurance rates set forth in the policy.[8] This breaching course of conduct continued, according to the plaintiff, when the defendant drew on the accumulated cash value of the policy to cover the excessive cost of insurance charges, which led to the ultimate lapse of the policy. We disagree. Although we conclude that the court properly determined that the continuing course of conduct doctrine does not apply under the circumstances of the present case, we reach this conclusion by way of an alternate rationale.

Our Supreme Court recently examined the purpose and application of the continuing course of conduct doctrine in *Watts* v. *Chittenden*, 301 Conn. 575, 22 A.3d 1214 (2011). "[That] court has recognized the continuing course of conduct doctrine in many cases involving claims sounding in negligence. For instance, [it has] recognized the continuing course of conduct doctrine in claims of medical malpractice. . . . In doing so, [it] noted that [t]he continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied. . . . The continuing course of conduct doctrine has also been applied to other claims of professional negligence in this state. . . .

"In these negligence actions, [our Supreme Court] has held that in order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that

---

[8] The plaintiff claims, and the defendant disputes, that the 100 percent rating factor set forth in the contract indicates that the plaintiff was classified as a standard risk. In other words, according to the plaintiff's reading of the contract, he should have been charged 100 percent of the standard risk premium, rather than double the standard risk premium that the defendant did charge him.

remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where [the court] upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. . . .

"Therefore, a precondition for the operation of the continuing course of conduct doctrine is that the defendant must have committed an initial wrong upon the plaintiff. . . .

"A second requirement for the operation of the continuing course of conduct doctrine is that there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. . . . [Our Supreme Court] has held this requirement to be satisfied when there was wrongful conduct of a defendant related to the prior act." (Citations omitted; internal quotation marks omitted.) Id., 583–85.

"In examining the use of the continuing course of conduct doctrine, [our Supreme Court was] mindful of the nature of the doctrine as [then] Chief Judge Richard Posner of the Seventh Circuit Court of Appeals has explained: 'A violation is called "continuing," signifying that a plaintiff can reach back to its beginning even if that beginning lies outside the statutory limitations period, when it would be unreasonable to require or even permit him to sue separately over every incident of the defendant's unlawful conduct. The injuries about which the plaintiff is complaining in [these] case[s] are the consequence of a numerous and continuous series

of events. . . . When a single event gives rise to continuing injuries . . . the plaintiff can bring a single suit based on an estimation of his total injuries, and that mode of proceeding is much to be preferred to piecemeal litigation despite the possible loss in accuracy. But in [cases in which the continuing course of conduct doctrine is applicable, each incident increases the plaintiff's injury]. Not only would it be unreasonable to require him, as a condition of preserving his right to have [the full limitations period] to sue . . . to bring separate suits [during the limitations period] after each [incident giving rise to the claim]; but it would impose an unreasonable burden on the courts to entertain an indefinite number of suits and apportion damages among them.

" 'In between the case in which a single event gives rise to continuing injuries and the case in which a continuous series of events gives rise to a cumulative injury is the case in which repeated events give rise to discrete injuries, as in suits for lost wages. If [a] plaintiff were seeking backpay for repeated acts of wage discrimination (suppose that every pay day for five years he had received $100 less than he was entitled to), he would not be permitted to reach back to the first by suing within the limitations period for the last. . . . As emphasized in *Pollis* [v. *New School for Social Research*, 132 F.3d 115, 119 (2d Cir. 1997)], the damages from each discrete act of discrimination would be readily calculable without waiting for the entire series of acts to end. There would be no excuse for the delay. And so the violation would not be deemed "continuing." ' " (Citations omitted.) *Watts* v. *Chittenden*, supra, 301 Conn. 587–89.

Our Supreme Court, looking to a case decided by a Texas Court of Appeals; *Twyman* v. *Twyman*, 790 S.W.2d 819 (Tex. App. 1990); explained that the doctrine

applies to cases, such as negligent infliction of emotional distress, that "involv[e] a continuing course of conduct which over a period of years cause[s] injury. Since usually no single incident in a continuous chain of tortious activity can fairly or realistically be identified as the cause of significant harm, it seems proper to regard the cumulative effect of the conduct as actionable." (Internal quotation marks omitted.) *Watts* v. *Chittenden*, supra, 301 Conn. 592.

The case now before us, where the plaintiff alleges that the defendant breached the insurance contract annually, at precisely identifiable moments when it allegedly overcharged the plaintiff, is analogous to the suit for lost wages as described by Chief Judge Posner. The plaintiff's damages arising from the defendant's alleged breaches were readily calculable and actionable at the time of breach, unlike those cases where it is the cumulative effect of the defendant's behavior that gives rise to the injury. Simply put, the plaintiff's allegations do not constitute a "course of conduct" by the defendant; but instead allege a series of repeated breaches over a period of years. Accordingly, the continuing course of conduct doctrine is inapplicable to the present case.[9] We, therefore, conclude that the court properly found that the doctrine did not serve to toll the six year statute of limitations set forth in § 52-576 (a).[10]

[9] We note that the continuing course of conduct doctrine is one classically applicable to causes of action in tort, rather than in contract. The doctrine concerns itself with "wrongs," the nomenclature of tort, not with "breach," the language of contract. See S. Thel and P. Siegelman, "You *Do* Have to Keep Your Promises: A Disgorgement Theory of Contract Remedies," 52 Wm. & Mary L. Rev. 1181, 1185–86 (2011) (conventional wisdom of contract law does not involve moral culpability of breaching party). Because, however, we have determined that the plaintiff's allegations do not constitute a "course of conduct" in the first instance, we need not address whether the continuing course of conduct doctrine may apply outside of actions in tort.

[10] The defendant also argues that the continuing course of conduct doctrine does not toll the statute of limitations because the plaintiff "discovered the allegedly actionable activity" when he inquired about his policy in 2003. See

## II

The plaintiff also claims that the court erred in rejecting his alternate argument that the statute of limitations did not bar the claims for breach of contract that occurred annually in the six years preceding the filing of this action or for the defendant's alleged breach of terminating the policy. We agree.

In rejecting the plaintiff's alternate argument, the court relied primarily on a Civil War era United States Supreme Court case, *New York Life Ins. Co.* v. *Statham*, 93 U.S. 24, 23 L. Ed. 789 (1876). *Statham* presented the question of whether several insureds' nonpayment of whole life insurance premiums was excused by the prohibition of commerce between members of the Confederacy and members of the Union during the Civil War, thereby allowing for the revival of their lapsed policies. Id., 28. As part of their argument to the Supreme Court, the plaintiff insureds analogized life insurance policies to fire insurance policies, which are renewed from year to year. Id., 30. The Supreme Court rejected this argument, reasoning that the annual payments toward a policy of life insurance are installment payments in consideration for an entire insurance for life, rather than payments that initiate a new contract for a given year. Id. Applying the principle set forth in *Statham* to the present case, the court found that the defendant's charging of the plaintiff, despite occurring annually, was indivisible, and therefore, did not serve to reinitiate the statute of limitations period.

*Statham*, however, does not control the factual scenario presented in this case. In *Statham*, the Supreme

*Rosato* v. *Mascardo*, 82 Conn. App. 396, 405, 844 A.2d 893 (2004) ("the continuing course of conduct doctrine has no application after the plaintiff has discovered the harm"). Because we already have determined that the continuing course of conduct doctrine is inapplicable to the facts of this case, we need not address this argument. We do, however, note that we are unaware of any authority that stands for the proposition that this principle would apply to actions for breach of contract.

Court rejected the insureds' contention that each annual premium payment initiated a new contract for life insurance. The Supreme Court did not decide the question of whether annual overcharges by the insurer may constitute discrete, but recurring, breaches of the contract, as the plaintiff in the present case argues. Although we agree with the general principle that a contract for life insurance is indivisible,[11] it does not follow then that a life insurance contract is not susceptible to repeated breaches.

---

[11] Because it is not necessary to the resolution of this appeal, we do not pass on the question of whether a variable universal life insurance policy, such as the plaintiff's, is, in fact, indivisible, as with whole life or term life insurance policies. We do note, however, that there are substantial differences among these kinds of policies. "Term life insurance is pure protection. The policyholder pays the insurance company a premium to protect against the risk of death for a limited time period . . . renewable at the insured's option. . . . Whole life was developed to solve the problem caused by individuals living to older ages when the premiums for term insurance became prohibitively expensive. With whole life the insured pays a level premium over the life of the policy. In early years the premium substantially exceeds the risk of mortality and policy expenses, and the insurance company uses this excess premium for investment and development of a policy reserve or cash value. The reserve value increases constantly over the life of the policy and makes up part of the policy death benefit. The insurance company's risk as measured by the difference between the policy death benefit and reserve value decreases over the life of the policy. At older ages the insurance company need not collect a 'term' type premium for the entire policy death benefit. Rather, it merely needs a premium sufficient to cover its decreasing risk exposure. . . .

"Universal life may be described as a repackaging of traditional whole life in which protection and accumulation elements found in whole life have been separated and unbundled. . . . When the policy-holder makes a [payment], the insurance company removes an expense charge. . . . The net deposit is then credited to the accumulation fund under the contract. As of an accounting date each month, the accumulation fund is credited with monthly interest, and a charge is made against the monthly cost of [insurance] . . . ." R. Shaw, "Universal Life Insurance—How It Works," 71 A.B.A. J. 68, 68–69 (1985). "The universal policy will lapse if the cash value or premium payments fall below the cost of insurance. Whole life policies, on the other hand, guarantee the death benefit so long as the premiums are paid. . . . [Because] [u]niversal life premium payments are credited to the insured's account along with interest income . . . the policy owner [has] certain discretion to increase or decrease premium payments as their financial situation changes over time." J. Kabaker, "Life Insurance in Estate

The defendant, each year, calculated the cost of insurance for the plaintiff based on his age, sex, and rating class. It then, periodically, deducted from the policy's accumulated cash value an amount necessary to cover that calculated cost of insurance. The plaintiff alleges that each year the defendant charged him for a cost of insurance that was in excess of the maximum amount allowed under the terms of the contract and then deducted that excessive amount from the policy's accumulated cash value. These actions, if found to be true, would constitute separate breaches by the defendant, several of which occurred within the statute of limitations period.[12] We conclude, therefore, that there exists a genuine issue of material fact as to whether the defendant breached the insurance contract. Accordingly, the rendering of summary judgment was improper.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other judges concurred.

Planning: Universal Life Insurance—A Ticking Time Bomb," 9 J. Pract. Est. Plan. 11, 11–12 (2007).

[12] The defendant argues that if it breached the contract at all, the breach occurred in 1992 when it assigned the plaintiff a 100 percent rating factor, and the plaintiff's claims are therefore time barred. This claim is unavailing. Although it may be true that the original assignment of the 100 percent rating factor was a breach of the insurance contract now outside the statute of limitations, that does not, by extension, place outside of the statute of limitations the alleged breaches of each subsequent annual application of the rating factor, the calculation of the cost of insurance charges based on

that application, and the deductions from the policy's accumulated cash value.