******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

SAINT BERNARD SCHOOL OF MONTVILLE, INC. *v.*
BANK OF AMERICA
(SC 19174)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued March 24—officially released August 5, 2014*

*Gerald L. Garlick*, with whom, on the brief, was *Katherine E. Abel*, for the appellant (defendant).

*Cassie N. Jameson*, with whom, on the brief, was *Michael D. Colonese*, for the appellee (plaintiff).

*Jeffrey J. Mirman* and *David J. Wiese* filed a brief for the Connecticut Bankers Association as amicus curiae.

*Opinion*

McDONALD, J. The plaintiff, Saint Bernard School of Montville, Inc., commenced this action against the defendant, Bank of America, after the defendant refused the plaintiff's demand to return more than $800,000 that one of the plaintiff's employees had obtained as a result of the defendant's actions permitting that employee to open a bank account that the plaintiff had not authorized, and to deposit into that account more than 1200 checks originating from, or intended to be deposited into, the plaintiff's bank account with the defendant, and then allowing that employee to withdraw those funds. The defendant appeals[1] from the trial court's judgment in favor of the plaintiff on claims of: breach of contract; violations of article 3 of the Uniform Commercial Code (UCC), General Statutes § 42a-3-101 et seq., and violations of article 4 of the UCC, General Statutes § 42a-4-101 et seq.; negligence; and common-law conversion. The defendant's principal claims on appeal are: (1) the trial court improperly precluded the jury from considering deposit account agreements on the ground that such agreements violate public policy; and (2) the jury's determination that certain statutes of limitations were tolled due to both a continuous course of conduct and a special relationship was based on an improper jury instruction and was unsupported by the evidence under the proper legal standard. We decline to address the merits of the first issue due to inadequate briefing on whether the purported improper ruling was harmful. We further conclude that, although the defendant is entitled to limited relief on its tolling claim as it pertains to damages for violation of the UCC, the defendant is not entitled to a new trial on the basis of any other claim asserted on appeal. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

The jury reasonably could have found the following facts. The plaintiff is a Catholic school located in Montville. In 1985, the plaintiff opened a bank account for its operating fund at the Montville branch of one of the defendant's predecessors (Montville branch).[2] A Montville branch employee had the plaintiff complete a certificate of authority for the account, an important document that the defendant requires that indicates who has been authorized by the account holder to "sign, endorse or otherwise authorize payments, transfers or withdrawals . . . ." The plaintiff periodically executed new certificates to modify the names of persons who held such authority. Four names were listed on the certificate executed in 2001, along with their titles: Nadine McBride, business manager; Roy Dado, principal; James Venditto, Jr., vice principal; and Howard Bennett, superintendent. In 2003, the plaintiff executed a new certificate to replace Dado's name with the names of two persons acting as principals. The certificate of

authority for the operating fund account was maintained in the files of the Montville branch manager. A signature card for persons authorized to transact business on that account was maintained in a vault area near the tellers. Similar information was on file for other accounts opened on behalf of the plaintiff at the Montville branch.

In 1998, the plaintiff hired Salvatore Licitra as a substitute bus driver and later promoted him to busing coordinator. Licitra's responsibilities gradually increased to include work in the plaintiff's business office. Licitra eventually was given access to the business office's computers and mail, as well as keys to the building in which the office was located. Although Licitra often delivered checks to the Montville branch that McBride had prepared for deposit, the plaintiff never listed Licitra as a person authorized to transact business on the operating fund account, or any other of its accounts with the defendant.

Nonetheless, in November, 2002, Donna Napolitano, the Montville branch manager, opened up an account at Licitra's request, using the plaintiff's tax identification number and bearing the name "Saint Bernard's High School Norwich Diocesan Camp Sunshine, c/o Sal Licitra" (Camp Sunshine account). Napolitano opened the Camp Sunshine account with a check payable to the plaintiff, marked "for deposit only," in the amount of $62.50. Napolitano did not obtain a certificate of authority or a signature card for the account, even though she knew that Licitra was not an authorized signer on the plaintiff's accounts and merely acted as a "courier" for the plaintiff when it needed to transact business with the defendant at the Montville branch. Instead, Napolitano falsely indicated on paperwork filled out in connection with the opening of the Camp Sunshine account that Licitra's signature was on file and noted "unlink" on account documents.

Three months after opening the account, Licitra had the defendant change the mailing address for the Camp Sunshine account from the plaintiff's business address to his residential address. In contravention of its policies, the defendant did not obtain the plaintiff's authorization to make the address change.

From November, 2002, until September, 2006, Licitra deposited $823,776.96 into the Camp Sunshine account and withdrew funds just short of that amount. The deposits almost exclusively were in the form of checks that either: (1) were drawn on the plaintiff's operating fund account and made payable to legitimate third party vendors, such as The Connecticut Light and Power Company; or (2) originated from third parties and were made payable to the plaintiff.[3] None of the checks originating from the plaintiff's operating fund account had been endorsed by the payee, the third party vendor. A majority of the checks payable to the plaintiff contained

a restrictive endorsement, indicating that the checks only should be deposited into the plaintiff's operating fund account; the others contained no endorsement. Thus, the deposit of these checks, as presented to the defendant, into the Camp Sunshine account did not conform to the defendant's own policies and standard bank practices.[4] In addition, Licitra made cash withdrawals for large sums, in amounts up to $22,000, which also should have required further scrutiny under the defendant's policies. Although Montville branch employees on occasion raised questions regarding the withdrawals, those questions were dismissed and the withdrawals were summarily approved by management.

McBride was unaware of the Camp Sunshine account until sometime after September, 2006, just after Licitra had left the plaintiff's employ due to the elimination of his position. Prior to that time, McBride regularly reviewed and reconciled the account statements for the operating fund account without noticing any unauthorized transactions or missing funds. Neither Napolitano nor any other bank employee ever mentioned the Camp Sunshine account to McBride or anyone else authorized on the plaintiff's operating fund account. In 2003, 2004, 2005, and 2006, the plaintiff's accountants sent to the Montville branch a "Standard Form to Confirm Account Balance Information with Financial Institutions," in which the defendant was requested to list any other accounts of which it was aware that were not listed. Although the defendant returned the forms to the accountants, it did not add the Camp Sunshine account to any of them, despite the fact that the account bore the plaintiff's name, the account was under the plaintiff's tax identification number, and its file was maintained with the other files for the plaintiff's accounts. In a fortuitous set of events that caused McBride to follow up on a vendor's payment, she discovered that the vendor never had received a check made out to it even though the check had cleared the plaintiff's operating fund account. After contacting the defendant, the plaintiff eventually discovered the existence of the Camp Sunshine account.

After the defendant refused the plaintiff's demand to return the funds that Licitra had funneled through the Camp Sunshine account to himself, the plaintiff commenced this action. The plaintiff asserted five counts in the operative complaint, each of which it alleged constituted a continuing course of conduct and breach of a continuing duty: (1) breach of contract; (2) violations of General Statutes §§ 42a-4-205 and 42a-4-401 for the improper deposit of checks into the Camp Sunshine account that were drawn on the plaintiff's operating fund account or other accounts and not properly payable to the Camp Sunshine account; (3) conversion in violation of General Statutes §§ 42a-3-206 and 42a-3-420 due to the deposit of checks into the Camp Sunshine

account that were payable to the plaintiff; (4) negligence; and (5) common-law conversion for the improper deposit of checks into the Camp Sunshine account that were issued by the plaintiff or payable to the plaintiff and that were not endorsed in a manner that would authorize deposit into that account.[5] The defendant filed an answer denying the substance of the allegations and asserted several special defenses, the following of which are relevant to this appeal: (1) the plaintiff is barred from obtaining relief on any of its claims because it failed to report the unauthorized transactions within the time period prescribed in deposit account agreements to which the plaintiff was bound; (2) none of the claims except breach of contract were brought within the period prescribed by statute; and (3) the plaintiff was contributorily negligent.

At trial, the jury was permitted to hear evidence regarding all of the special defenses. After the close of evidence, however, the court struck the deposit account agreements and all related testimony on public policy grounds, a matter that we discuss further in part I of this opinion. Thereafter, the jury rendered a verdict in favor of the plaintiff on each of the counts and awarded $823,776.96 in total compensatory damages.[6] In its interrogatories, the jury found, inter alia, that the applicable limitations periods had been tolled due to both a continuing course of conduct and a special relationship between the parties, that the plaintiff's loss was caused in part by its own contributory negligence in the amount of 5 percent, and that the plaintiff was entitled to prejudgment interest. The trial court subsequently denied the defendant's motions to set aside the verdict and for remittitur and granted the plaintiff's motion for prejudgment interest. After the trial court rendered judgment in accordance with the jury's verdict, the defendant appealed from the judgment.

The defendant raises four claims on appeal: (1) the trial court improperly precluded the jury from considering the deposit account agreements; (2) the plaintiff could not prevail on its breach of contract claim because it failed to prove the existence of a contract; (3) each check was subject to its own statute of limitations, which began to run on the date of the check and was not tolled for any reason; and (4) the trial court improperly denied the defendant's motion for remittitur. We conclude that the defendant is entitled only to limited relief on the third claim, insofar as the jury found a basis to toll the plaintiff's claims under the UCC.

I

We begin with the defendant's claim that the trial court improperly precluded the jury from considering the deposit account agreements. Those agreements, which slightly varied in their terms over the pertinent period, substantively provide that an account holder agrees to review monthly account statements and other

materials accompanying the statement and to look for unauthorized transactions and errors. The account holder further agrees that, if it finds such transactions or errors upon review, it will notify the defendant within a specified time period, either thirty or sixty days after the defendant sent the statement. If notification is not provided as prescribed, the account holder cannot seek any relief from the defendant. The trial court ruled that the agreements: (1) offend the UCC, specifically General Statutes § 42a-4-103, which precludes a bank from disclaiming responsibility for its lack of good faith or failure to exercise ordinary care; and (2) violate public policy as a disclaimer of liability under the factors that this court identified in *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 330, 885 A.2d 734 (2005).

On appeal, the defendant claims that the trial court misconstrued the agreements as disclaimers of liability and that the agreements are not void under either basis cited by the trial court. In response, the plaintiff contends that the agreements are unenforceable on both grounds, and that, even if they are enforceable, the defendant failed to demonstrate that it was harmed by the court's decision precluding them. For the reasons set forth subsequently in this opinion, we conclude that the defendant failed to brief an essential aspect of its claim—whether the trial court's ruling was harmful. Because such harm is not self-evident in light of the facts and procedural posture relative to this issue, the defendant is not entitled to review of this claim.

Examination of the parties' briefs reveals the following facts. The defendant argued in its main brief to this court that the question of whether the trial court improperly refused to allow the jury to consider the deposit account agreements was subject to plenary review. The defendant explained at length why it believed the trial court's decision was improper, but failed to address whether the ruling was harmful. In its responsive brief, the plaintiff contended that the trial court's ruling was an evidentiary matter subject to review under the abuse of discretion standard. The plaintiff further contended that the defendant must show that the ruling was not only improper but also harmful, meaning that the ruling likely affected the verdict. The plaintiff enumerated several reasons why the defendant could not demonstrate such harm.[7] In its reply brief, the entirety of the defendant's response to this issue was as follows: "As this was not an evidentiary issue, *there is therefore no issue of whether the trial court's ruling was both wrong and harmful.* The legal conclusion reached by the trial court is subject to plenary review. *Even if there were an issue of whether the ruling that the agreements were void and unenforceable was harmful, the trial court's ruling was clearly harmful as it deprived the jury of the opportunity to even consider the deposit account agreements*

*and the effect those agreements would have on the plaintiff's claims.*" (Emphasis added.) The defendant did not elaborate on this matter further at oral argument before this court.

It is well settled that, absent structural error, the mere fact that a trial court rendered an improper ruling does not entitle the party challenging that ruling to obtain a new trial. An improper ruling must also be harmful to justify such relief. See *Wiseman* v. *Armstrong*, 295 Conn. 94, 106–10, 989 A.2d 1027 (2010) (explaining concerns of judicial economy and equity that underlie requirement of showing that error is harmful in order to be entitled to new trial). The harmfulness of an improper ruling is material irrespective of whether the ruling is subject to review under an abuse of discretion standard or a plenary review standard. See id., 109–10 (citing various types of legal claims to which court has applied harmless error review); *Santopietro* v. *New Haven*, 239 Conn. 207, 216, 682 A.2d 106 (1996) ("[w]here claims of trial court impropriety have been properly preserved and, therefore, are entitled to plenary review, we determine whether the ruling of the trial court is legally correct and, if it is not, whether the error was likely to have affected the verdict"); see, e.g., *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 291, 295, 838 A.2d 135 (2004) (concluding, after conducting plenary review, that defendant could not prevail because any error from legally improper instruction was harmless); *Doyle* v. *Kamm*, 133 Conn. App. 25, 39–42, 35 A.3d 308 (2012) (concluding, after conducting plenary review of ruling precluding certain evidence, that plaintiff could not prevail in absence of record establishing harm from ruling). When the ruling at issue is not of constitutional dimensions, the party challenging the ruling bears the burden of proving harm. See *Downs* v. *Trias*, 306 Conn. 81, 94, 49 A.3d 180 (2012).

In the present case, the defendant has done nothing more than state a summary conclusion as to harm. It would be entitled to a new trial, therefore, only if the harmfulness of the trial court's ruling is so self-evident as to make briefing unnecessary. We conclude that, although the deposit account agreements were asserted as a special defense to all counts in the complaint, any harm from precluding the jury's consideration of them is not self-evident given the record before us as to this issue.

Significantly, the trial court's ruling excluding the deposit account agreements was not made until after the close of evidence, just before the parties' closing arguments and the trial court's charge to the jury.[8] Thus, the defendant presented all of the evidence that it would have, had the court not belatedly struck the agreements and all references thereto. As a special defense, it was the defendant's burden to prove that these agreements

were part of its contract with the plaintiff and that the plaintiff had failed to satisfy the terms of the agreements. *Leonetti* v. *MacDermid, Inc.*, 310 Conn. 195, 215, 76 A.3d 168 (2013). The defendant offered into evidence as full exhibits the deposit account agreements effective in 2002, 2004, 2005, and 2006, with the relevant provision read aloud to the jury. The defendant had the opportunity to elicit testimony through both direct and cross-examination regarding the plaintiff's obligations and efforts to review the operating fund account statements.[9] In presenting its own case, the defendant failed to produce a witness to testify that a reasonable examination of the account statements and accompanying materials would have revealed some or all of the unauthorized transactions. The defendant also failed to put into evidence any of the operating fund account statements. In its cross-examination of the plaintiff's witnesses, the defendant elicited no testimony to discredit McBride's testimony that she had regularly reviewed and reconciled the account statements without finding anything of concern. With respect to checks originating from the plaintiff's operating fund account, the defendant did elicit testimony regarding McBride's procedure for issuing checks to third party vendors, but none of that testimony tended to show that McBride would have discovered from a review of the account statements that these checks were unauthorized transactions. McBride's testimony suggested that Licitra had created false or duplicate invoices in the plaintiff's accounts payable system, for which McBride had authorized the issuance of checks. Thus, McBride's review of the statements revealed that a check that she had intended to issue for an amount that she had approved was debited from the plaintiff's operating fund account as she had expected. Although McBride admitted that she had not examined the back of each check to see how it was endorsed in the course of her review, a third party's deposit of a check lacking that party's endorsement would not necessarily indicate that the check had not been received by the payee. McBride testified that no vendor had ever called to complain that it had not received payment due after a check for that vendor had been issued and cleared the plaintiff's account. With respect to checks payable to the plaintiff from third parties, no testimony was elicited regarding these specific transactions. Of course, McBride could not have reviewed those checks because presumably they were delivered to Licitra along with the Camp Sunshine account statements reflecting their deposit therein.

The harmfulness of the trial court's ruling, if improper, is also not self-evident in light of the jury's verdict on the defendant's special defense of contributory negligence. The defendant asserted eight specific allegations as to how the plaintiff was contributorily negligent, each of which was included in the court's

charge to the jury.[10] The last of those allegations was that the plaintiff had "failed to review bank statements that were sent to the plaintiff by the defendant, which bank statements would have alerted the plaintiff to the alleged unauthorized transactions and alleged unauthorized account." Thus, the defendant was free to, and did, argue to the jury the substance of the plaintiff's obligations under the deposit account agreements, but in the context of a different special defense. The jury, however, found the plaintiff only 5 percent contributorily negligent in light of all eight allegations. This finding suggests that the jury did not conclude that, had the plaintiff exercised reasonable care in reviewing its statements and accompanying materials, it would have discovered the unauthorized transactions.

In light of these facts, we cannot conclude that the harm from the claimed improper ruling is so self-evident as to relieve the defendant of its obligation to brief this issue. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Citibank, N.A.* v. *Lindland*, 310 Conn. 147, 165, 75 A.3d 651 (2013). Therefore, the defendant is not entitled to review of this claim on the merits. Because we conclude hereinafter that the defendant is not entitled to a new trial on the basis of any other claim advanced on appeal, we decline to opine on whether the deposit account agreements are void as contrary to public policy, either generally or under the particular circumstances highlighted by the plaintiff, i.e., where the jury has determined that the defendant committed common-law conversion.

II

We next turn to the defendant's claim that the plaintiff was not entitled to prevail on its breach of contract claim because it failed to prove that a contract existed between the parties. The defendant contends that the only two documents offered by the plaintiff as proof of that contract, the 2001 and 2003 certificates of authority for the operating fund account, were insufficient to establish that fact. Specifically, the defendant asserts that these documents are insufficient because they did not reflect an offer and acceptance or certain essential terms—the name of the bank, persons authorized to act on behalf of the plaintiff, and obligations imposed on the defendant. We conclude that the evidence was sufficient to support the jury's finding that a contract existed.

"In reviewing the jury's verdict, we construe the evidence in the light most favorable to sustaining the verdict. . . . The verdict will be set aside and judgment directed only if we find that the jury could not reason-

ably and legally have reached [its] conclusion." (Citations omitted; internal quotation marks omitted.) *Suffield Development Associates Ltd. Partnership* v. *Society for Savings*, 243 Conn. 832, 843, 708 A.2d 1361 (1998).

"To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties. . . . So long as any essential matters are left open for further consideration, the contract is not complete. . . . A court may, however, enforce an agreement if the missing terms can be ascertained, either from the express terms or by fair implication. *Presidential Capital Corp.* v. *Reale*, 231 Conn. 500, 507–508, 652 A.2d 489 (1994)." (Citations omitted; internal quotation marks omitted.) *Geary* v. *Wentworth Laboratories, Inc.*, 60 Conn. App. 622, 627–28, 760 A.2d 969 (2000). "[W]hether a term is essential turns on the particular circumstances of each case." (Internal quotation marks omitted.) *Pan Handle Realty, LLC* v. *Olins*, 140 Conn. App. 556, 567, 59 A.3d 842 (2013). Moreover, "[i]n the case of a bilateral contract, the acceptance of the offer need not be express but may be shown by any words or acts which indicate the offeree's assent to the proposed bargain." *Bridgeport Pipe Engineering Co.* v. *DeMatteo Construction Co.*, 159 Conn. 242, 246, 268 A.2d 391 (1970); see also *Thames River Recycling, Inc.* v. *Gallo*, 50 Conn. App. 767, 798, 720 A.2d 242 (1998) ("[t]he manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act" [internal quotation marks omitted]).

It is broadly recognized that "[t]he relationship between a bank and a depositor is a contractual relationship that is governed by the written agreement between the parties. By opening an account and delivering funds constituting the deposit, one becomes a 'depositor,' and a contractual relationship is created. The bank deposit creates a valid contract by which the bank is obligated to repay the funds subject to its rules and applicable statutes." (Footnotes omitted.) 10 Am. Jur. 2d 670, Banks and Financial Institutions § 711 (2009). "The deposit agreement, if any, signature card, and checks drawn against an account are the contract documents between a bank and its customer . . . ." (Footnotes omitted.) Id., § 714, p. 674; see also *Das* v. *Bank of America, N.A.*, 186 Cal. App. 4th 727, 741, 112 Cal. Rptr. 3d 439 (2010) ("[t]he relationship of bank and depositor is founded on contract . . . which is ordinarily memorialized by a signature card that the depositor signs upon opening the account" [internal quotation marks omitted]).

In the present case, the plaintiff proffered not only

the certificates of authority, but also signature cards. The certificates reflect an express agreement that the plaintiff cannot hold the defendant liable for transactions undertaken by those persons authorized to act on the plaintiff's behalf, and an implicit agreement that the defendant may be liable if it allows others not so authorized to access the plaintiff's funds. Cf. *Chase* v. *Waterbury Savings Bank*, 77 Conn. 295, 299–300, 59 A. 37 (1904) ("[b]y accepting from the bank and using, as she did, the deposit-book in which [a]rticles 13 and 15 of the by-laws were printed, the plaintiff assented to these regulations and they became a part of the contract of deposit for the protection of the bank and the depositor, and were binding alike upon both"); see also *Royal Arcanum Hospital Assn. of Kings County, Inc.* v. *Herrnkind*, 113 App. Div. 3d 672, 673, 978 N.Y.S.2d 355 (2014) ("[a] bank and its depositor have the contractual relationship of debtor and creditor, with an implicit understanding that the bank will pay out a customer's funds only in accordance with its instructions" [internal quotation marks omitted]). Although no bank was named on the 2001 certificate of authority, there was evidence from which the jury reasonably could infer that one of the defendant's predecessors was the party to that certificate. See *Ubysz* v. *DiPietro*, 185 Conn. 47, 51, 440 A.2d 830 (1981) ("to form a contract . . . the identities of the contracting parties must be *reasonably* certain" [citations omitted; emphasis added]). In addition, the plaintiff presented testimonial and documentary evidence of a depositor-bank relationship that commenced on a date certain in 1985 and extended for more than a twenty year period. See *Menicocci* v. *Archer National Bank of Chicago*, 67 Ill. App. 3d 388, 391, 385 N.E.2d 63 (1978) ("[a] debtor/creditor relationship exists between the depositor and the bank . . . and the express *or implied* contract between the depositor and the bank controls their relationship" [citation omitted; emphasis added]); *University National Bank* v. *Wolfe*, 279 Md. 512, 514, 369 A.2d 570 (1977) ("Almost a hundred years ago this [c]ourt found that the relationship between a bank and its depositor was perfectly well settled. . . . The relationship, which has been universally recognized . . . is that of debtor and creditor, with the rights between the parties considered as contractual, and derived by implication from the banking relationship unless modified by the parties." [Citations omitted; internal quotation marks omitted.]). Therefore, we conclude that there was sufficient evidence from which the jury reasonably could find that a contract existed between the parties.

### III

We next turn to the defendant's challenge to the findings contained in the jury's interrogatories relating to the tolling of the statute of limitations, namely, that the defendant's actions constituted a continuing course of conduct and that a special relationship existed between

the parties.

We note at the outset that it is undisputed that tolling is irrelevant to the plaintiff's breach of contract claim, as all of the transactions at issue occurred within the six year period prescribed for such claims. See General Statutes § 52-576. We further note that the jury awarded the same amount of damages on the breach of contract claim (count one), $818,620.54, as it did on the negligence claim (count four), prior to a deduction for the plaintiff's contributory negligence, and on the common-law conversion claim (count five). Therefore, it is unnecessary for us to consider the defendant's tolling argument as it applies to counts four and five, as the jury's award on count one is duplicative of its award on those counts. With respect to the plaintiff's UCC claims (counts two and three), however, the jury collectively awarded $823,776.96, or $5156.42 more than it awarded on the breach of contract claim. Therefore, if the defendant prevails on its tolling argument with respect to these counts, it could be entitled to relief to the extent that the award on counts two and three exceeds the award on count one. Accordingly, we consider the defendant's tolling argument solely as it applies to the only claims on which we can afford it any relief, albeit limited.[11]

The defendant claims that each check was subject to its own statute of limitations, which began to run on the date of the check and was not tolled for any reason. It contends, inter alia, that there was insufficient evidence to support the jury's findings regarding tolling.[12] We conclude that, even construing all of the evidence in the light most favorable to sustaining the verdict, as we must; *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 442, 815 A.2d 119 (2003); the evidence was insufficient to support either of the jury's findings in support of tolling.

As we previously indicated, in determining whether the evidence supports the jury's findings, we review the record to determine whether the jury "reasonably *and legally*" could have reached its conclusion. (Emphasis added.) *Suffield Development Associates Ltd. Partnership* v. *Society for Savings*, supra, 243 Conn. 843. "[W]e have held that in order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." (Inter-

nal quotation marks omitted.) *Bednarz* v. *Eye Physicians of Central Connecticut, P.C.*, 287 Conn. 158, 170, 947 A.2d 291 (2008); accord *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 203, 746 A.2d 730 (2000).

Our appellate courts have not defined precisely what constitutes a special relationship for purposes of tolling because the existence of such a relationship will depend on the circumstances that exist between the parties and the nature of the claim at issue. Usually, such a special relationship is one that is built upon a fiduciary or otherwise confidential foundation. "A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other. . . . The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him." (Citations omitted.) *Dunham* v. *Dunham*, 204 Conn. 303, 322, 528 A.2d 1123 (1987), overruled in part on other grounds by *Santopietro* v. *New Haven*, supra, 239 Conn. 213 n.8; see, e.g., *Konover Development Corp.* v. *Zeller*, 228 Conn. 206, 218, 635 A.2d 798 (1994) (general and limited partners bound in fiduciary relationship because partners act as trustees toward each other and toward partnership); *Alaimo* v. *Royer*, 188 Conn. 36, 37, 41, 448 A.2d 207 (1982) (fiduciary relationship between elderly disabled woman and president of real estate investment club on whom she had been encouraged to rely). "Fiduciaries appear in a variety of forms, including agents, partners, lawyers, directors, trustees, executors, receivers, bailees and guardians." *Konover Development Corp.* v. *Zeller*, supra, 222. "The fact that one business person trusts another and relies on [the person] to perform [his obligations] does not rise to the level of a confidential relationship for purposes of establishing a fiduciary duty." (Internal quotation marks omitted.) *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 41, 761 A.2d 1268 (2000) "[N]ot all business relationships implicate the duty of a fiduciary. . . . In the cases in which this court has, as a matter of law, refused to recognize a fiduciary relationship, the parties were either dealing at arm's length, thereby lacking a relationship of dominance and dependence, or the parties were not engaged in a relationship of special trust and confidence." (Internal quotation marks omitted.) *Biller Associates* v. *Peterken*, 269 Conn. 716, 723–24, 849 A.2d 847 (2004). Accordingly, a mere contractual relationship does not create a fiduciary or confidential relationship. See *Fichera* v. *Mine Hill Corp.*, 207 Conn. 204, 210, 541 A.2d 472 (1988).

In the context of a claim between a depositor and a bank under the UCC, we conclude that it is appropriate to look to cases considering whether such parties have established a fiduciary or confidential relationship. It is well settled, however, that "[g]enerally there exists

no fiduciary relationship merely by virtue of a borrower-lender relationship between a bank and its customer." *Southbridge Associates, LLC* v. *Garofalo*, 53 Conn. App. 11, 19, 728 A.2d 1114, cert. denied, 249 Conn. 919, 733 A.2d 229 (1999). "The fact that a bank is indebted to its account holders for the amount of the funds that they have deposited . . . imposes no special duty of care for the safekeeping of the funds on deposit." (Citations omitted.) *Frigon* v. *Enfield Savings & Loan Assn.*, 195 Conn. 82, 87, 486 A.2d 630 (1985). Accordingly, the plaintiff must assert and demonstrate additional circumstances that establish more than a bank-depositor relationship.

In support of the jury's finding of a special relationship for purposes of tolling, the plaintiff points to the following facts: the plaintiff was a customer of the defendant for more than twenty years; the plaintiff was one of the Montville branch's biggest customers; the Montville branch is a small branch that is located one and one-half miles from the plaintiff; the plaintiff had several accounts with the defendant; and the branch manager, Napolitano, was familiar with the plaintiff and its employees. We conclude that these facts, without more, did not give rise to a unique degree of trust and confidence sufficient to establish a fiduciary or confidential relationship as a matter of law. Moreover, even if we were persuaded by the plaintiff's contention that some special relationship other than a fiduciary relationship could support tolling, these facts would not satisfy a reasonable standard for that term. Indeed, we note that many of the plaintiff's allegations do not relate to its relationship with the defendant, but specifically and exclusively to its relationship with the Montville branch.

Therefore, we consider the other basis for tolling—the breach of a duty that remained in existence after commission of the original wrong related thereto, established through later wrongful conduct related to the prior act. In considering this question, we are mindful that "[t]he continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied." (Internal quotation marks omitted.) *Watts* v. *Chittenden*, 301 Conn. 575, 583–84, 22 A.3d 1214 (2011). As to what constitutes a continuing violation of a breach, this court cited with approval the following explanation: "In between the case in which a single event gives rise to continuing injuries and the case in which a continuous series of events gives rise to a cumulative injury is the case in which repeated events give rise to discrete injuries . . . . [In such a case] the damages from each discrete act . . . would be readily calculable without waiting for the entire series of acts to end. There would be no excuse for the delay. And so the violation would not be deemed continuing."

(Citations omitted; internal quotation marks omitted.) Id., 588–89.

Because our analysis is limited to the jury's verdict in favor of the plaintiff on counts two and three, alleging violations of the UCC, we begin with an examination of those counts. Count two alleged violations of §§ 42a-4-205 and 42a-4-401. This count relates to checks drawn on the plaintiff's operating fund account that were improperly paid or deposited into the Camp Sunshine account because the checks either were not endorsed or were not properly endorsed by the payee. Count three alleged violations of §§ 42a-3-206 and 42a-3-420. This count relates to checks payable to the plaintiff that the defendant improperly accepted for deposit into the Camp Sunshine account or improperly paid to a person not entitled to deposit or to obtain payment on them.

The fundamental defect with these claims with regard to tolling principles is that there is no commission of an original wrong under these provisions of the UCC. The defendant breached no duty under the UCC provisions at issue by opening the Camp Sunshine account for Licitra, by failing to inform the plaintiff of this account or by mailing the statements for this account to Licitra. Rather, it is the defendant's conduct in depositing or paying these checks that constituted the breach of the defendant's duties under the UCC. Each check so deposited or paid constituted a discrete violation of the UCC. There is no difficulty in identifying each wrongful act or assigning a remedy for that wrong. Although undoubtedly the defendant's conduct in opening the account for Licitra facilitated, or even made possible, Licitra's theft of the plaintiff's funds, that conduct is not a breach of a duty owed under the relevant provisions of the UCC. See *Martinelli* v. *Fusi*, 290 Conn. 347, 357, 963 A.2d 640 (2009) ("[w]hen presented with a motion for summary judgment under the continuous course of conduct doctrine, we must determine whether there is a genuine issue of material fact with respect to whether the defendant: [1] committed an initial wrong upon the plaintiff; [2] owed a continuing duty to the plaintiff *that was related to the alleged original wrong*; and [3] continually breached that duty" [emphasis added; internal quotation marks omitted]). Therefore, the evidence does not support the jury's finding of a continuing course of conduct under counts two and three.

In the absence of a basis for tolling, the plaintiff's claims under the UCC were subject to a three year statute of limitations. See General Statutes §§ 42a-3-118 (g) and 42a-4-111. Therefore, an action under these provisions for any wrongful deposit or payment occurring more than three years before the plaintiff commenced the present action would be time barred. Because the plaintiff filed the present action on May 6,

2008, any checks wrongfully paid or deposited more than three years prior to this date cannot be a basis for recovery. It is evident from the accounting summary that the plaintiff provided to the jury that, prior to May 6, 2005, Licitra deposited into and withdrew from the Camp Sunshine account an amount many times in excess of $5156.42, the difference between the breach of contract award and the award for violations of the UCC. Therefore, the defendant is entitled to a reduction in damages of $5156.42.

IV

Last, we turn to the defendant's argument that the trial court improperly denied its motion for remittitur. The defendant contends that the motion should have been granted for two reasons. First, the plaintiff obtained insurance proceeds of $100,000 toward the loss that it sustained.[13] Second, the jury determined that prejudgment interest should begin to run on November 8, 2002, the date on which the defendant opened the Camp Sunshine account, when the only " 'wrongful detention' " of the plaintiff's money on that date was the initial deposit of $62.50.[14]

Our analysis of this claim is guided by settled principles. "The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions." (Internal quotation marks omitted.) *Saleh* v. *Ribeiro Trucking, LLC*, 303 Conn. 276, 281, 32 A.3d 318 (2011). The relevant inquiry is whether the verdict falls within the necessarily uncertain limits of fair and reasonable compensation or whether it so shocks the conscience as to compel the conclusion that it was due to partiality, prejudice or mistake. See id.

We can readily dispose of the defendant's claim insofar as it relates to the plaintiff's insurance proceeds. Under case law dating back more than one century, this court has held that "a defendant is not entitled to be relieved from paying any part of the compensation due for injuries proximately resulting from his act where payment comes from a collateral source, wholly independent of him." *Lashin* v. *Corcoran*, 146 Conn. 512, 515, 152 A.2d 639 (1959); accord *Regan* v. *New York & New England Railroad Co.*, 60 Conn. 124, 130, 22 A. 503 (1891) (concluding that party causing loss was not entitled to reduction due to payment by insurance company); but see *Jones* v. *Riley*, 263 Conn. 93, 103, 818 A.2d 749 (2003) (explaining that General Statutes § 52-225a legislatively abrogated common-law collateral source rule with respect to actions to recover for personal injuries). "The reason for the [collateral source] rule . . . is that a windfall ought not to be granted to a defendant. . . . If there must be a windfall certainly it is more just that the injured person shall

profit therefrom, rather than the wrongdoer shall be relieved of his full responsibility for his wrongdoing." (Citation omitted; internal quotation marks omitted.) *Gorham* v. *Farmington Motor Inn, Inc.*, 159 Conn. 576, 580, 271 A.2d 94 (1970).

The case law cited by the defendant in support of its position is wholly inapposite, as the funds that were the subject of remittitur in those cases were in the form of settlements from joint tortfeasors, and the trial court concluded in the exercise of its discretion that remittitur *was* warranted. See *Alfano* v. *Ins. Center of Torrington*, 203 Conn. 607, 610–11, 525 A.2d 1338 (1987); *Peck* v. *Jacquemin*, 196 Conn. 53, 71, 491 A.2d 1043 (1985). Indeed, we note that the defendant's characterization of the insurance proceeds as pure double recovery overlooks the fact that the plaintiff presumably paid premiums to obtain those proceeds.

With respect to the defendant's claim regarding prejudgment interest, we note that the plaintiff neither requested, nor was awarded, interest on the entire amount of damages beginning on November 8, 2002. Rather, the plaintiff's motion for prejudgment interest requested 2 percent interest per year on each check with interest beginning to accrue from the date of each check's deposit. The award of interest conforms to the exhibit submitted by the plaintiff calculating interest for each check. The first of those checks simply was deposited on November 8, 2002, and thus the interest on that first deposit began to accrue on that date.

Accordingly, the award in this case neither shocks the conscience of this court nor falls outside the limits of just damages. Nonetheless, in light of our conclusion in part III of this opinion that the damage award was excessive by $5156.42, the defendant also is entitled to a proportionate reduction in interest.

The judgment is reversed only with respect to the award of damages and interest and the case is remanded with direction to reduce the award of damages by $5156.42 and to proportionately reduce prejudgment interest. The judgment is affirmed in all other respects.

In this opinion the other justices concurred.

[1] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The account was opened at the Montville branch of Connecticut National Bank, which later became Fleet Bank, which in turn became the defendant in or around 2005. For convenience, we refer to the Montville branch without distinguishing which bank had possession of the plaintiff's funds at various time periods, and to the defendant as the operative bank.

[3] With some minor variations, most of the checks were made payable to Saint Bernard High School or Saint Bernard Academy.

[4] The plaintiff offered expert testimony on commercial law and reasonable commercial standards of the banking industry.

[5] The plaintiff amended an earlier complaint to eliminate any allegations that the checks deposited into the Camp Sunshine account bore unauthorized or forged signatures/endorsements in response to the defendant's special defense that claims predicated on fraudulent signatures or endorsement were time barred under the UCC.

[6] The jury interrogatories reflected that the jury had found in favor of the plaintiff on all five counts, and indicated as follows:

Part A—Breach of Contract: yes, the contract existed; yes, the contract was breached; the total of damages suffered as a result of breach: $818,620.54;

Part B—Negligence: (1) yes, the defendant was negligent; the damages suffered: $818,620.54; yes, the defendant proved that the plaintiff was contributorily negligent; the percentage loss caused by the defendant's negligence: 95 percent; the percentage loss caused by the plaintiff's negligence: 5 percent; the award as reduced by the percentage of the plaintiff's negligence: $777,689.51;

Part C—Conversion: yes, the defendant converted the plaintiff's funds; the total amount of damages suffered as a result of the defendant's conversion: $818,620.54;

Part D—Checks from the Plaintiff's Operating Fund (§ 42a-4-401): yes, the defendant deposited checks into the Camp Sunshine account that were from the plaintiff's operating fund and had either no endorsement or restrictive endorsement; the dollar amount of those checks: $516,476.75;

Part E—Checks Payable to the Plaintiff (§ 42a-3-420): yes, the defendant deposited checks into the Camp Sunshine account that were payable to the plaintiff in violation of § 42a-3-420; the total amount of those checks: $298,562.37;

Part F—Checks with Restrictive Endorsements to the Plaintiff (§ 42a-3-206): yes, the defendant deposited checks into the Camp Sunshine Account that were payable to the plaintiff and had restrictive endorsements directing that payment be made to the plaintiff in violation of § 42a-3-206; the total amount of those checks: $307,300.21;

Part G—Tolling: yes, the defendant engaged in a continuous course of conduct; yes, the parties had a special relationship from 2002 through 2006;

Part H—Interest: yes, the plaintiff is entitled to prejudgment interest; 2 percent per year is the appropriate rate of interest; the wrongful detention began on November 8, 2002.

The $823,776.96 award was the total amount of damages under Part D and Part F. It is unclear why the total award under those provisions exceeds the damages found under parts A, B (prior to the reduction for contributory negligence) and C. The defendant did not challenge the difference between these damage amounts in its motion for remittitur.

[7] The plaintiff claimed that there was no evidence that it had found unauthorized transactions upon its review of the statements as required to trigger notice obligations, that, in fact, there was evidence to the contrary, and that the defendant had not even introduced the operating fund account statements into evidence. The plaintiff also claimed that: there was no evidence that the agreements formed part of the contract governing the plaintiff's operating fund; even if the account agreements were part of the contract, they are not enforceable because the jury found that the defendant had materially breached its contract; they do not apply to the claims asserted in counts one and five as they are predicated on allegations of bad faith and intentional acts; and they do not bar judgments predicated on negligence or violations of the UCC because the allegations extend beyond liability for the processing of unauthorized withdrawals. Our concern focuses on the evidentiary question relating to the plaintiff's knowledge of unauthorized transactions.

[8] The plaintiff had filed a motion in limine to exclude the deposit account agreements on the grounds that they: (1) do not apply to the plaintiff's operating account; and (2) are unenforceable because they violate § 42a-4-103 of the UCC and public policy under the factors identified in *Hanks* v. *Powder Ridge Restaurant Corp.*, supra, 276 Conn. 314. The trial court held a hearing on the motion before the first day of trial, but did not issue a decision. After the close of the plaintiff's case-in-chief and its denial of the defendant's motion for a directed verdict, the court continued the hearing on the motion in limine. At the end of the hearing, the court concluded that there was sufficient evidence for the jury to consider whether the agreements were part of the plaintiff's contract with the defendant, but did not address the enforceability of the agreements. After the close of evidence, the trial court permitted the defendant to file an amended answer and defenses in response to the plaintiff's recently amended complaint. In connection with the amended answer and defenses, the trial court ruled on the issue previously raised by the plaintiff's motion in limine, ruling that "the exculpatory language in the [deposit] account agreements is unenforceable pursuant to [§] 42a-4-103, and as a matter of public policy pursuant to *Hanks* . . . ." Before the parties made closing arguments to the jury, the court stated to the jury: "[T]he court has made a ruling in your absence concerning some

exhibits and I'm advising you that the court has excluded defendant's exhibits A, B, C and D as evidence of any contract between the plaintiff and the defendant and the jury should not consider these exhibits or reference to these exhibits in oral testimony by witnesses and/or reference to them in other exhibits. I believe we will also bring that up, again, in our charge. But I wanted to advise you of that, because that ruling was made outside of your presence." Shortly thereafter, in its closing argument, the plaintiff reiterated: "His Honor told you a little while ago that those deposit—those so-called deposit account agreements, exhibits A through D that were put in evidence when you were last here on Friday, as His Honor told you, those have been stricken. You are not to consider those as part of this case. So the question with the checks is: Did the bank put them in the account against the rules and against the law?" In its charge, the court further stated: "It is up to you to decide whether or not the documents relied on by the plaintiff constitute a contract and whether or not the defendant breached that contract. In making your determination, on this or any other issue in the case, you may not consider the defendant's exhibits A, B, C and D as part of the contract, or any testimony you heard about the terms contained in these exhibits."

[9] Outside the presence of the jury, the defendant conceded that the deposit account agreements would apply to the plaintiff's operating fund account only, not the Camp Sunshine account.

[10] The special defense alleged as follows: "On information and belief, the plaintiff was guilty of negligence which was a contributing cause of any loss allegedly sustained by the plaintiff, in that the plaintiff:

"(a) allowed . . . Licitra to obtain possession of and endorse the checks that are the subject of the plaintiff's complaint;

"(b) did not take proper and necessary precautions to prevent . . . Licitra, an allegedly unauthorized signatory, from having access to, taking possession of and endorsing the checks that are the subject of the plaintiff's complaint;

"(c) did not take proper and necessary precautions to prevent . . . Licitra, an allegedly unauthorized signatory, from using the plaintiff's accounts payable system to generate allegedly fraudulent checks which were then signed by authorized signatories and deposited into the Camp Sunshine account;

"(d) failed to use reasonable care to detect the alleged removal and/or endorsement of the checks;

"(e) failed to adopt and implement a policy or procedure to detect the removal and/or endorsement of the checks;

"(f) did not take proper and necessary precautions to prevent . . . Licitra from having access to and taking possession of signature stamp(s);

"(g) failed to conduct a criminal background check on . . . Licitra prior to his employment; and

"(h) failed to review bank statements that were sent to the plaintiff by the defendant, which bank statements would have alerted the plaintiff to the alleged unauthorized transactions and alleged unauthorized account."

[11] The defendant does not contend that this tolling doctrine is per se inapplicable to claims under the UCC, but that it is merely inapplicable under the facts of the case. Although our Appellate Court has questioned the extent to which this doctrine applies outside of claims sounding in tort, we have no occasion to consider that question in the present case. See *Fradianni* v. *Protective Life Ins. Co.*, 145 Conn. App. 90, 100 n.9, 73 A.3d 896 ("We note that the continuing course of conduct doctrine is one classically applicable to causes of action in tort, rather than in contract. The doctrine concerns itself with 'wrongs,' the nomenclature of tort, not with 'breach,' the language of contract. . . . Because, however, we have determined that the plaintiff's allegations do not constitute a 'course of conduct' in the first instance, we need not address whether the continuing course of conduct doctrine may apply outside of actions in tort." [Citation omitted.]), cert. denied, 310 Conn. 934, 79 A.3d 888 (2013).

[12] The defendant also challenges the jury instruction on tolling. The plaintiff contends that the instruction was proper, relying in part on the fact that it largely mirrored the Judicial Branch's model jury instruction. See Connecticut Civil Jury Instructions (2008) instruction 3.3-3, available at http://jud.ct.gov/JI/Civil/part3/3.3-3.htm (last visited July 24, 2014). In light of our conclusion that the evidence does not support the jury's findings under a proper application of the law to the evidence relating to the claims under the UCC, we need not examine the propriety of the jury instruction.

[13] The plaintiff does not dispute that it received insurance proceeds. Nei-

ther party has indicated the nature and basis for the insurance recovery.

[14] The defendant also contends that the plaintiff took the position that interest did not begin to accrue until September 6, 2006, which appears to be the date of the final transaction on the Camp Sunshine account. The defendant made no such argument in its motion for remittitur and we therefore need not consider this contention.

———————————————————